DURIE TANGRI LLP
RAGESH K. TANGRI--#159477
    rtangri@durietangri.com
MICHAEL H. PAGE--#154913
    mpage@durietangri.com
DAVID McGOWAN--#154289
    dmcgowan@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:  (415) 362-6666
Facsimile:   (415) 236-6300

*Attorneys for Defendants' and Counterclaimants' Counsel*
Fish & Richardson P.C.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| OPENWAVE SYSTEMS, INC.,<br>    a Delaware corporation, and<br><br>OPENWAVE SYSTEMS (ROI) LTD.,<br>    its Republic of Ireland Subsidiary,<br><br><br><br>                                   Plaintiffs,<br><br><br>    v.<br><br>724 SOLUTIONS (US) INC.,<br>    a Delaware Corporation, and<br><br>724 SOLUTIONS SOFTWARE INC.,<br>    a Delaware Corporation,<br><br><br>                                   Defendants. | Case No. 09-CV-03511-RS<br><br>**SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION TO DISQUALIFY**<br><br>Date:      March 25, 2010<br>Time:      1:30 p.m.<br>Location: SF Courtroom 3, 17th Floor<br>Judge:     The Hon. Richard Seeborg |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Common sense counts.  That is the most important holding of *Kirk v. First American Title Insurance Company*, No. B218956, 2010 WL 1346403 (Cal. App. 2 Dist. Apr. 17, 2010).  Under *Kirk* it matters that the information most relevant here is ten years old.  It matters that the lawyer who did most of the work opposing a patent application Motorola filed in Australia left Fish & Richardson P.C. ("F&R") in 2001.  It matters that all of F&R's work for Openwave ended in 2004.  It matters that most of F&R's work on this case is done in Atlanta, not Silicon Valley, and it matters very much that F&R has screened the lawyers who did Openwave work from this case.

*Kirk* affirms what F&R stated in its Opposition papers:  disqualification is a discretionary remedy to be applied only when necessary to protect a former client from the likely misuse of its confidential information in a later case.  Opp. Part 3(D).  No "automatic rule" of imputation or disqualification compels this court to turn a blind eye to practical facts.  The court may and should consider all facts relevant to determining whether there is "a genuine likelihood that allowing [F&R] to remain on the case will affect the outcome of the proceedings before the court" because F&R's trial team is likely to "receive *and use* the information . . . in the pending action."  2010 WL 1346403, at *22 (emphasis added).  We show below there is no genuine likelihood that F&R has any Openwave information that could be used against Openwave here.  Even if F&R were presumed to have such information there is no chance whatever that it would be used against Openwave, particularly given F&R's use of an ethical screen complying with the standards articulated in *Kirk*.

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

I.     *Kirk* **Affirms There Is No** *Per Se* **Rule of Imputed Disqualification And That An**

**Appropriate Screen May Rebut The Presumption of Shared Confidences**

*Kirk* involved disclosures made to an attorney named Gary Cohen when he was general counsel

to Fireman's Fund Insurance Company.  Counsel for plaintiffs in a set of related class actions against

First American Insurance Company called Mr. Cohen to discuss retaining him as a consultant.  During

this conversation plaintiffs' counsel "conveyed attorney work product to Cohen, including plaintiffs'

theories of the case, and their concerns regarding defense strategy and tactics.  Plaintiffs' counsel also

disclosed their estimates of the value of the cases."  2010 WL 1346403, at *2.

Mr. Cohen chose not to accept the work at that time.  He later moved to the Sonnenschein firm,

where plaintiffs' counsel contacted him again.  This time he declined the work because of conflicts.

About a month later the lawyers who defended the First American class actions moved from the Bryan

Cave firm to Sonnenschein.  Sonnenschein was not aware of the conflict before those lawyers arrived

and imposed no screen upon their arrival.  It did impose a screen a couple of days later, when plaintiffs'

counsel complained. 2010 WL 1346403, at *3.  After the screen was created, Mr. Cohen performed

work for First American (in a different case) that related to administrative exhaustion questions at issue

in the class action cases for which he had been contacted, and which were defended by the lawyers who

joined Sonnenschein from Bryan Cave.  *Id.* at *4.

The trial court disqualified Sonnenschein from defending First American in the class actions and

First American appealed.  Twenty-four of the nation's leading firms filed a brief as *amicus curiae*

arguing that the law does not impose a *per se* rule compelling disqualification of an entire firm in such

cases and that ethical screens are consistent with both high professional standards and the realities of

modern legal practice.

The court of appeal reversed.  It acknowledged that Mr. Cohen received material confidential

information about the same matter in which his partners were defending First American, and it held this

information was presumptively imputed to his partners.  The court found presumptive imputation is the

general rule in California.  2010 WL 1346403, at *12.  The court held, however, that the presumption is

1    rebuttable and does not lead to automatic disqualification.  Rather, in appropriate circumstances the

2    presumption "can be refuted by evidence that ethical screening will effectively prevent the sharing of

3    confidences in a particular case."  *Id.*

4    **II.    *Kirk's* Reasoning Confirms That Disqualification Is Appropriate Only Where There Is A**

5    **Genuine Risk That A Client's Confidential Information Will Be Used Against It.**

6        *Kirk* makes clear the substantial relationship test is not a theoretical doctrine about "relatedness"

7    in the abstract.  The test has a purpose:  to protect former clients from harm caused by misuse of their

8    confidences in a later case. *Kirk* states:

9        The purpose of a disqualification order is prophylactic, not punitive. . . . . the issue is
         whether there is a *genuine likelihood* that allowing the attorney to remain on the case will
10       affect the outcome of the proceedings before the court. When considering vicarious
         disqualification of a firm based on the presence of a tainted attorney, the issue is whether
11       there is a likelihood that other attorneys at the firm may receive *and use* the information
         possessed by the tainted attorney in the pending action. (internal citations omitted);
12       emphasis added)

13   2010 WL 1346403, at *22.

14       This language affirms that the substantial relationship test turns not on the likelihood that two

15   cases are related in some general way but on the likelihood that a former client's confidential

16   information will be used against it.  That is why F&R has emphasized the materiality element of

17   substantial relationship analysis, which *Kirk* includes in the very first sentence of the opinion.  2010 WL

18   at 1346403, at *1 ("When an attorney obtains confidential information from a client, that attorney is

19   prohibited from accepting a representation adverse to the client in a matter to which the confidential

20   information would be *material*.") (emphasis added).  Materiality is the only element of the test that ties

21   the notion of relatedness to the risk that a former client's confidences will be *used* in the case at hand,

22   and *Kirk's* language closely parallels the black letter standard of materiality.[1]

23

---

24   [1] *Cf Fremont Indemnity Co. v. Fremont Gen. Ins. Co*., 143 Cal. App. 4th 50, 67 (2006) ("The subject of a

25   current representation is substantially related to the subject of a prior representation *only if* the issues are
     sufficiently similar to support a reasonable inference that the attorney in the course of the prior

26   representation was likely to have obtained confidential information material to the current
     representation") (emphasis added) and (material information is that "found to be *directly at issue in*, or

27   have some critical importance to, the second representation") (emphasis added) *Id.* at 69.

28

1       *Kirk* endorses two stages of practical, probabilistic analysis that relate the substantial relationship

2   test to the prophylactic purpose the opinion identifies.  The first stage analyzes whether a lawyer

3   obtained in a prior representation information material to a later case.  In some cases, such as *Kirk* itself,

4   there is no doubt on this point.  In other cases, such as this one, the answer is not at all clear.  As the

5   court pointed out at argument (Transcript [Docket 154] 5:2-4; 11:5-8), when a moving party relies on

6   discussions about technology, as Openwave does here (*id.*, 18:17-24), it is difficult to distinguish

7   information that is generally known, such as how the Internet and mobile phones work, from

8   information that truly is confidential to a particular client.  This difficulty creates a serious problem

9   because, as the parties agree, only the latter sort of information may support disqualification.

10       Presuming some amount of disclosure does not solve this problem.  Both parties agree F&R is

11   presumed to have obtained confidential information reasonably necessary to do its work for Openwave.

12   As the discussion at argument showed, however, the parties disagree on what communications should be

13   presumed to have been part of that work.  The documentary record either reflects publicly known

14   information (the Motorola opposition) or speaks inconclusively about "technology" (the billing records).

15       Whose technology? Openwave says there is no reason to assume the references to "technology"

16   do not include its technology as well as Motorola's.  *Id.*, 13:4-9.  F&R believes that position just reflects

17   a failure of proof by the party who bears the burden.  That there is no reason not to believe a discussion

18   occurred is not a reason to believe it did, and the objective scope of the assignment—opposing someone

19   else's patent application in Australia—provides no such reason either.  Reciting the phrase "substantially

20   related" does not help. F&R agrees with Openwave's counsel that the phrase is just a conclusory term.

21   *Id.,* 45:24-25.  The truth of the matter is that there is no precise way to construct this hypothetical set of

22   presumptively disclosed information.

23       At a minimum, therefore, F&R believes the record shows substantial uncertainty about whether

24   in its prior work F&R obtained confidences material to this case.  Under *Kirk* that uncertainty counts.

25   The less likely it is that material information was acquired in the first representation, the more likely it is

26   that a protective screen is an adequate safeguard of the client's interests, and the less necessary it is to

27   disqualify counsel to protect a former client against misuse of information.

28

1  **III.    Even If There Were A Hypothetical Risk Justifying A Presumption of Imputation F&R**

2  **Has Rebutted That Presumption Here Through The Use of An Effective Ethical Screen**

3         The second stage of analysis under *Kirk* presumes that a lawyer has material confidential

4  information and asks whether it is likely that other lawyers in his firm will use that information to harm

5  a former client.  *Kirk* affirms a presumption that such information is shared with other lawyers in the

6  firm but holds that "in the proper circumstances, the presumption is a rebuttable one, which can be

7  refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a

8  particular case." 2010 WL 1346403, at *12.  Three aspects of this ruling are particularly important here.

9         First, *Kirk* undertakes a comprehensive review of the cases and shows that California has never

10 imposed an automatic, irrebuttable presumption that confidences possessed by one lawyer taint an entire

11 firm. 2010 WL 1346403, at *7-12.  Disqualification is a discretionary remedy, as F&R said, not a

12 mandatory one.  In endorsing screening as a means to rebut the presumption of imputation, therefore,

13 *Kirk* does not change California law.  Disqualification orders were always reviewed for an abuse of

14 discretion and, apart from lawyers who switched sides in the same pending case, no court had held that it

15 would be an abuse of discretion to recognize an ethical screen as a means of safeguarding client

16 confidences.

17        Second, consistent with its practical approach and its focus on the misuse of information, *Kirk*

18 endorsed screens whenever they effectively safeguard a former client's confidences.  It did not limit its

19 holding by adopting inflexible rules limiting screening to particular situations.  This aspect of the

20 opinion refutes two limitations Openwave may attempt to place on the opinion.  Some jurisdictions limit

21 screening to cases where a lawyer was not substantially involved in the earlier representation.  (The

22 California Rules Revision Commission considered such a rule as well.) *Kirk* discussed the rules in these

23 states, 2010 WL 1346403, at *14-15, but the opinion does not adopt such a limitation.  Indeed, it could

24 not:  though Mr. Cohen's call with plaintiffs' counsel was brief the information he received—the

25 plaintiffs' strategies and valuations of the cases—is highly material.

26        In addition, some rules endorse screening only when a lawyer has moved from one firm to

27 another.  *E.g.,* ABA Model Rule 1.10(a)(2).  *Kirk* arose when attorneys changed firms, but the court's

28

5

reasoning and its holding are not limited to that circumstance. *Kirk* emphasized with italics the rule that expert firms may employ screens to rebut the presumption of shared confidences even among current employees who received confidences while employed by a single firm. 2010 WL 1346403, at *16.[2] The court did not distinguish this rule from the pragmatic rule it adopted; it instead grouped experts together with other forms of successful screening and held "[t]here is no legitimate reason to believe that *the same screening* could not work in the context of private attorneys at a private firm." *Id*. (emphasis added).[3] On this issue as on all others, *Kirk* eschews formal distinctions and instead compels a practical inquiry into whether, given a screen, there is any real danger that a former client's confidences will be used against it in a later proceeding.[4]

Third, even if one or more F&R lawyers are presumed to have confidential information material to this case, disqualification is not appropriate here because the ethical screen F&R has implemented satisfies the standards *Kirk* establishes for rebutting any presumption of shared confidences. *Kirk* sets forth two necessary conditions for such a screen. First, the screen must be imposed in a timely manner rather than only after a court order. 2010 WL 1346403, at *19. F&R created its screen as soon as Openwave asserted a conflict, Freeman Decl. [Docket 107] at ¶¶7, 8; Barkan, Green, and Setty Decls. [Docket 106, 108, 109] ¶4, which is what happened in *Kirk* as well. 2010 WL 1346403, at *3.

*Kirk* also requires that an ethical screen include preventative measures to guard against disclosure. 2010 WL 1346403, at *19. *Kirk* identified five such measures:

> [1] physical, geographic, and departmental separation of attorneys; [2] prohibitions against and sanctions for discussing confidential matters; [3] established rules and procedures preventing access to confidential information and files; [4] procedures

---

[2] *See Western Digital Corp. v. Superior Court,* 60 Cal. App.4th 1471 (1998). As here, the relevant expert in *Western Digital* joined his firm after it initially acquired confidential information. Unlike this case, the persons primarily responsible for acquiring that information were still at the firm and were consulted by the expert whose later retention led to the disqualification proceedings.

[3] In addition, Mr. Cohen worked for First American on issues relevant in the class actions for which he had been consulted while both he and the lawyers defending those actions were at Sonnenchein. 2010 WL 1346403, at *4. The *Kirk* court found such work created a factual issue regarding the adequacy of Sonnenschein's screen but it did not find the work rendered screening impossible. *Id*. at *22.

[4] This point is in any event turns largely on what Openwave believes is its best argument—F&R's work in 2001 opposing a Motorola patent application in Australia. Only one lawyer remaining at F&R, Hans Troesch, was involved in that matter – to the tune of a handful of hours. Structurally, therefore, this case is not materially different than it would be if Mr. Troesch had done the Motorola work for a previous firm and moved to F&R.

6

preventing a disqualified attorney from sharing in the profits from the representation; and [5] continuing education in professional responsibility."

*Id.* (citation omitted).  F&R satisfies each criterion with ease.

First, most of the F&R attorneys relevant to the alleged conflict work in different offices.  The trial team is based in Atlanta, where Mr. Setty and Mr. Green work.[5]  Supplemental Declaration of John Freeman ("Freeman Supp. Decl.") ¶2.  No attorney at F&R performed Openwave work from that office (*id.*), and Messrs Setty and Green in any event joined F&R in 2006, two years after all F&R's Openwave work had ceased and five years after the Motorola opposition had been completed in Silicon Valley and the attorney most involved in that opposition had left the firm.  Setty Decl. ¶2; Green Decl. ¶2; Freeman Decl. ¶¶3, 4.

Second, F&R's screen prohibits disclosure and includes policies and procedures to prevent accidental sharing of information.  As set forth in the accompanying Supplemental Declaration of John Freeman, those measures include locking screened attorneys out of electronic files, notifying every employee in every office of the screen, labeling files to prevent access, and physically gathering and turning over to the firm's risk management partner the few physical files remaining from the long-closed Openwave matters, most of which are in storage or have been returned to the client.  The firm has confirmed with every affected attorney to confirm that these measures had been and are being followed.  Freeman Supp. Decl. ¶6.

Third, no F&R lawyer who performed Openwave work has a particular financial stake in the outcome of this case, and no such lawyer supervises any lawyer working on the case.  *Id., ¶*7.  Equity principals will receive only their usual share of the firm's profits.  Relying on comments to the ABA's imputation rule, *Kirk* specifically notes that such interests do not render screens ineffective.  2010 WL 1346403, at *20.  Lastly, all the relevant lawyers are current in all applicable CLE requirements.  *Id.*, ¶8.

*Kirk* stresses that these elements are not requirements.  They are simply things commonly taken into account in assessing the risk that a former client's confidential information could be used against it in a later case:

---

[5] Mr. Barkan is in Silicon Valley but, as the court is no doubt aware from case management activities to date, he is local counsel, not lead counsel.  F&R's local office accounts for only 0.5 % of its billings in this matter.  Freeman Supp. Decl., ¶2.

1

2

> Any ethical wall must ultimately be judged by whether it is sufficient to meet its purpose: satisfying the trial court that the tainted attorney has not had and will not have any involvement with, or communication concerning, the litigation which would support a reasonable inference that confidential information was or will be disclosed.

3  2010 WL 1346403, at *21.

4      Under this standard, this is an easy case. *Kirk* endorses screening where the tainted lawyer, Mr.

5  Cohen, learned the plaintiffs' theories, concerns about possible defenses, and the plaintiffs' "estimates of

6  the value of the cases" that were still being handled by the Bryan Cave lawyers when they joined Mr.

7  Cohen at Sonnenschein. *Id.* at *2. The telephone call tainting Mr. Cohen was short but there was no

8  dispute that the yield of confidential information was very high.

9      Here, in contrast, it is at a minimum highly questionable whether F&R lawyers received

10  confidential information material to this case in the first place. If they did, they received it ten years ago

11  and the person who knew it best left the firm nine years ago. The Motorola opposition is not still

12  pending, as were the class actions in *Kirk*. Mr. Cohen remembered his call. It would be a shock if any

13  lawyer on either side of F&R's work remembered conversations from 2001, and in fact the record

14  (including Mr. Minsk's s own sworn declaration) shows that no lawyer on either side does. There is no

15  reason to believe Mr. Troesch's memory is any more omniscient than Mr. Minsk's, nor any reason to

16  doubt Mr. Troesch's sworn declaration that he does not recall any confidences from the Motorola

17  matter. Troesch Decl. [Docket 110] ¶4.

18      And that, ultimately, is the point of *Kirk*. Litigants should not be deprived of their chosen

19  counsel based on unrealistic presumptions that do not square with reality. Common sense counts. Every

20  common sense factor points to one conclusion here: there was no realistic risk of misuse of confidential

21  information in this case to begin with, and to the extent one might wonder about such a problem it has

22  been dealt with properly, in the manner in which conscientious lawyers around the country deal with

23  such issues.

24

25

26

27

28

1

2 **CONCLUSION**

3       Openwave never was at risk of harm from misuse of its confidential information in this case, and

4 it is not at such risk now.  F&R's ethical screen addresses any reasonable concern on that score.

5 Openwave's motion to disqualify F&R therefore should be denied.

6

7 Dated: April 13, 2010                             DURIE TANGRI LLP

8

9                            By:     */Michael H. Page/*

10                               RAGESH K. TANGRI
                              MICHAEL H. PAGE

11                               DAVID McGOWAN

12                            *Attorneys for Defendants' and*
                           *Counterclaimants'*

13                            *Counsel, Fish & Richardson P.C.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28